613 A.2d 1186

Sophie MASLOFF, individually and as Mayor of the City of Pittsburgh, and the City of Pittsburgh,

v.

PORT AUTHORITY OF ALLEGHENY COUNTY, William Millar, Executive Director, Port Authority of Allegheny County, Amalgamated Transit Union, Local 85 and Larry L. Klos, President, Amalgamated Transit Union Local 85.

Appeal of AMALGAMATED TRANSIT UNION LOCAL 85 and Larry L. Klos, President, Amalgamated Transit Union Local 85.

Supreme Court of Pennsylvania.

Submitted June 10, 1992.

Decided July 29, 1992.

418

Joseph J. Pass, Mary Jo Miller, Jubelirer, Pass & Intrieri, P.C., Pittsburgh, for appellants.

Mary K. Conturo, City Sol., Robert B. Smith, Asst. City Sol., Richard J. Joyce, Asst. City Sol., Pittsburgh, for Sophie Masloff and the City of Pittsburgh.

Donald P. Minahan, Deputy Atty. Gen., Robert M. Brown, Peter J. Ennis, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for Port Authority of Allegheny County and William Millar.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

ZAPPALA, Justice.

Amalgamated Transit Union Local 85 (Local 85) and its President, Larry L. Klos, appeal from the adjudication and decree entered on April 10, 1992, by Judge Silvestri Silvestri of the Commonwealth Court permanently enjoining the work stoppage by the Union and directing the authorized representatives of Local 85 and the Port Authority of Allegheny County (PAT) to engage in court-supervised negotiations until an agreement was reached.[1]

Local 85 is the certified collective bargaining representative for approximately 2,700 individuals employed by PAT. Local 85 and PAT were parties to a collective bargaining agreement that expired by its terms on November 30, 1991. The parties' negotiations for a successor agreement were initiated in October, 1991, but were unsuccessful.

On March 16, 1992, the members of Local 85 went on strike. On March 31, 1992, Sophie Masloff, individually and as the mayor of the City of Pittsburgh, and the City of Pittsburgh filed a Complaint in Equity against PAT and Local 85 in the Court of Common Pleas of Allegheny County seeking, inter

---

1. Local 85 also challenges the provision of Judge Silvestri's decree directing that neither the parties nor the participants in the court-supervised negotiations shall make any public statements relating thereto without prior authorization of the court. We will not address this issue as neither of the parties has asserted that the Commonwealth Court has denied it authorization to make any public statements upon request.

alia, injunctive relief enjoining the strike. The City also filed an Application for Extraordinary Relief with this Court requesting that we assume plenary jurisdiction of this matter under 42 Pa.C.S.A. § 726. On April 1, 1992, we entered an order assuming jurisdiction of this matter.

Local 85 filed an answer to the equity complaint and PAT filed preliminary objections in the nature of a petition raising the defense of lack of capacity to sue. We dismissed PAT's preliminary objections by Order of Court dated April 6, 1992, and determined that the City had standing to bring the Complaint in Equity. We remanded the matter to Commonwealth Court for expedited disposition and directed that President Judge David Craig assign the matter forthwith for disposition.

President Judge David Craig assigned the matter to Judge Silvestri. Hearings were held by Judge Silvestri on April 7–9, 1992, during which the City introduced testimony of various witnesses to demonstrate that the strike created a clear and present danger and a threat to the health, safety, and welfare of its citizens. Judge Silvestri concluded that the City had presented sufficient evidence of the far-reaching effect that the strike had upon commercial, academic, medical and social institutions and that the evidence submitted by PAT was neither of the quantity nor quality sufficient to rebut the overwhelming evidence presented by the City.[2] Based upon the evidence, Judge Silvestri determined that a ·permanent injunction enjoining Local 85 from continuing the work stoppage was necessary to ensure the safety of the citizens and to prevent the immediate and irreparable harm that would result from a denial of the requested relief. An adjudication and decree was entered on April 10, 1992, enjoining the work stoppage, establishing a schedule for the representatives of Local 85 and PAT to engage in court-supervised negotiations, and directing the parties and participants to refrain from making any public statements without prior court approval.

On April 13, 1992, Local 85 filed an Application for Expedited Stay and Injunction Pending Appeal with this Court which

2. Local 85 did not present any evidence during the hearings.

was denied by order dated May 5, 1992. Local 85 appeals from the adjudication and decree issued by Judge Silvestri. Local 85 asserts that the City could not maintain an equity action to enjoin the strike under Section 3(k) of the Second Class County Port Authority Act (Port Authority Act), 55 P.S. § 563.2(k), and that the permanent injunction could not have been issued as a matter of law.

The standard of review of a decision by an equity court is limited. A chancellor's findings of fact will not be disturbed absent an abuse of discretion, a capricious disbelief of the evidence, or a lack of evidentiary support on the record for the findings. A chancellor's conclusions of law are subject to stricter scrutiny. Unless the rules of law relied on are palpably wrong or clearly inapplicable, however, a grant of injunctive relief will not be reversed on appeal. *Jersey Shore Area School District v. Jersey Shore Education Association,* 519 Pa. 398, 548 A.2d 1202 (1988).

Prior to its amendment in 1986, the Port Authority Act required PAT to submit any labor dispute concerning wages, salaries, hours, working conditions or benefits to arbitration by a board composed of three persons. The board members included a member chosen by PAT, a member chosen by the employees' representative, and a third member to be agreed upon by PAT and the employees' representative. The determination of the majority of the board members was final and binding on all matters in dispute. The employees did not have a right to strike after the term of a collective bargaining agreement had expired.

The collective bargaining provisions of the Port Authority Act were substantially revamped by the legislative amendments in 1986. Section 3 of the Port Authority Act, 55 P.S. § 563.2, establishes the revised collective bargaining procedures governing PAT and its employees. Collective bargaining must begin at least one hundred days prior to the expiration of a collective bargaining agreement. In the case of any labor dispute where collective bargaining does not result in an agreement, the dispute may be submitted to final and binding interest arbitration only with the written consent of both

parties. The composition of the board of arbitration and the method of selecting its members remained the same as provided for in the previous statute.

When the parties have agreed to submit the labor dispute to binding arbitration, all contract provisions remain the status quo during the period of arbitration. No lock-outs, strikes, or other interference with or interruption of transit operations are permitted during the arbitration period. 55 P.S. § 563.-2(f).

Within forty-five days of the termination date of the collective bargaining agreement, either party may make a written request for the appointment of a neutral factfinder by the Pennsylvania Labor Relations Board (PLRB). When factfinding has not been requested by either party prior to the expiration of the term of the collective bargaining agreement, both parties must immediately make a written request that the PLRB appoint a neutral factfinder. Collective bargaining may continue during the factfinding process. 55 P.S. § 563.-2(g).

Within forty-five days of the appointment, the factfinder must submit findings of facts and recommendations to the PLRB and both parties. 55 P.S. § 563.2(i). The parties are required to notify the PLRB and each other whether or not the recommendations of the factfinder are accepted. The findings and recommendations are publicized if they are rejected. 55 P.S. § 563.2(j).

Once the recommendations have been rejected and PAT and the employees' representative have refused to mutually agree to final and binding interest arbitration, the employees shall have the right to strike in regard to that dispute. No strike is permitted, however, until the completion of a thirty-day "cooling-off" period, beginning immediately after the termination of the collective bargaining agreement. 55 P.S. § 563.2(l). When the employees have exercised their right to strike, the Port Authority Act provides:

> . . . such strike shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public: Provided that such

strike shall not be prohibited on the grounds that it creates a clear and present danger or threat to the health, safety or welfare of the public unless the court's order granting relief further mandates that both parties submit the labor dispute to final and binding interest arbitration by a board of arbitration under the provisions of this section. No party, other than the authority, shall have any standing to seek any relief in any court of this Commonwealth under this subsection.

55 P.S. § 563.2(k).

In its equity action, the City challenges the constitutionality of this provision insofar as it denies access to the courts to any party other than PAT to seek injunctive relief to prohibit a strike when there is a clear and present danger or threat to the health, safety or welfare of the public. The City asserts that § 563.2(k) violates Article 1, Section 11 of the Pennsylvania Constitution to the extent that the City is denied access to the courts to enjoin the strike. The City contends also that § 563.2(k) is an impermissible delegation to PAT of its duty to protect the health, safety, and welfare of its citizens in contravention of Article 3, Section 31 of the Pennsylvania Constitution.

The burden of proof rests on the one challenging the constitutionality of a legislative enactment. It is presumed that lawfully enacted legislation is constitutional. The challenger must meet the burden of rebutting the presumption of constitutionality by a clear, palpable, and plain demonstration that the statute violates a constitutional provision. *James v. Southeastern Pennsylvania Transportation Authority,* 505 Pa. 137, 477 A.2d 1302 (1984).

It is indeed troubling and at times disconcerting that parties to an agreement cannot resolve their disputes in an amicable fashion. Be that as it may, the courts cannot and will not sit idly by while others who are non-participants in the dispute essentially suffer the greatest harm. In the wisdom of the framers of the Pennsylvania Constitution, such incidents were anticipated so that the framers provided that where a legal

injury is sustained, there shall and will always be access to the courts of this Commonwealth.

■ Article 1, Section 11 of the Pennsylvania Constitution provides:

All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

"It is the constitutional right of every person who finds it necessary or desirable to repair to the courts for the protection of legally recognized interests to have justice administered without sale, denial or delay." *Commonwealth ex rel. Duff v. Keenan*, 347 Pa. 574, 33 A.2d 244 (1943). Article 1, Section 11 can be invoked only with respect to a legal injury. *Jackman v. Rosenbaum Co.*, 263 Pa. 158, 106 A. 238 (1919), aff'd 260 U.S. 22, 43 S.Ct. 9, 67 L.Ed. 107 (1922).

Local 85 contends that the Legislature was acting within its authority to foreclose certain avenues of relief for aggrieved plaintiffs and that Article 1, Section 11 does not grant every individual or entity who believes that a wrong has been suffered a right of redress in the courts. Concurring in that position, PAT asserts that the City does not have a legally cognizable interest in the matter because the 1986 amendments to the Port Authority Act gave PAT the sole right to seek injunctive relief. The rationale underlying their conclusion is that the Legislature has eliminated a cause of action for all those who are injured by a transit strike, except for PAT. The Legislature has not in fact done so.

■ The Legislature has neither eliminated a cause of action nor foreclosed an aggrieved individual from seeking redress in the courts. Section 563.2(k) expressly recognizes that the health, safety, and welfare of the public may be endangered by a transit strike, and, also, that redress for such injury may be sought in the courts. The oddity of the statute is that while the Legislature has not extinguished a cause of

action for injuries sustained by the public as a result of a transit strike, it has restricted standing to seek any relief in the courts to PAT, a party which is not representative of the public. Thus, while the public has a legally cognizable interest that may be protected by resort to the courts, by legislative design access to the courts is denied unless PAT exercises its discretion to seek relief for the injury to the public.[3]

In vesting the discretion to seek redress for a legal injury in an entity other than the one who sustains the injury, the statutory provision has run afoul of Article 1, Section 11 of the Pennsylvania Constitution. While Article 1, Section 11 does not prevent the Legislature from extinguishing a cause of action in all instances, it does prevent the Legislature from denying an injured party the right to seek relief from the courts for a legal injury by vesting that right solely in a third party who has the absolute discretion to choose whether to do so. PAT may well exercise its prerogative to not seek injunctive relief in the courts. The administrative decisions made by PAT in declining to exercise that option cannot deprive an individual of the right to seek a remedy from the courts for any legal injury sustained as a result of the strike. To the extent that Section 563.2(k) restricts standing to seek relief in any court of this Commonwealth under subsection (k) to PAT, it is hereby declared to be unconstitutional.

▮ Local 85 contends that the City failed to establish the existence of a clear and present danger to the public that would justify the issuance of an injunction. The case law definition of "clear and present danger" which has been employed in the context of labor disputes by public employees under the Public Employee Relations Act, 43 P.S. § 1101.101 et seq. is applicable in this instance. In *Armstrong Education Association v. Armstrong School District*, 5 Pa.Cmwlth. 378,

3. In contrast to the discretion vested in PAT to seek relief for the injury sustained by the public, the Public Employe Relations Act, 43 P.S. § 1101.101 et seq., makes it mandatory for a public employer to initiate an action for equitable relief in instances where the strike creates a clear and present danger or threat to the health, safety, or welfare of the public. 43 P.S. § 1101.1003.

383, 291 A.2d 120, 123 (1972) (citation omitted.), the Commonwealth Court utilized the following definition:

The "clear" in that epigram is not limited to a threat indubitably etched in every microscopic detail. It includes that which is not speculative but real, not imagined but actual. The "present" in the epigram is not restricted to the climatically imminent. It includes that which exists as contrasted with that which does not yet exist and that which has ceased to exist.

The ordinary inconveniences resulting from a strike will not suffice to establish a clear and present danger to the health, safety, or welfare of the public. The concept of "clear and present danger" will encompass the consideration of the effects which are ordinarily incidental to a strike, however, when such matters accumulate to such an extent, have continued for so long, or are aggravated by unexpected developments that the public's health, safety, or welfare is endangered. *Bristol Township Education Association v. School District*, 14 Pa. Cmwlth. 463, 322 A.2d 767 (1974).

█ In his adjudication and decree, Judge Silvestri addressed the testimony that was introduced by the City, stating:

During the parade of thirty (30) witnesses presented by the City, testimony was elicited about the impact of the mass transit strike upon families, individuals, and businesses. Blind, epileptic, professional, student, and blue-collar witnesses testified about the effect of the lack of public transportation upon their lives. While the lack of such transportation is a matter of inconvenience for some, it is devastating to others. Renal, cancer and psychiatric patients are often unable to get to appropriate medical facilities for treatment. Emergency medical services are delayed in attempts to reach citizens in need. Citizens are endangering their safety by walking along public roads to get to work because other modes of transportation are unavailable. Residents have been forced to find alternate living accommodations with friends or family because of the inaccessibility to work, school or day care. From the testimony pre-

sented, the City has demonstrated the far-reaching effect the strike has had upon commercial, academic, medical and social institutions.

Local 85 argues that the evidence was insufficient because it reflected what one would ordinarily expect to occur in the event of a cessation of virtually all public transportation in a metropolitan area. The City's evidence did not simply establish the disruption of the witnesses' daily routines, however. The evidence established, inter alia, that public services, such as ambulance, fire, and police services, were severely hampered by the increased traffic congestion resulting from the strike. To the extent that Local 85's argument suggests that the adverse effect on and threat to essential public services such as fire and police protection and emergency medical services are the ordinary and anticipated consequences of a transit strike, we are unpersuaded. We conclude that reasonable grounds existed for the equitable relief ordered by Judge Silvestri.

■ The remaining issue is whether Judge Silvestri erred in failing to order PAT and Local 85 submit their unresolved labor dispute to binding arbitration. Prior to its amendment, the Port Authority Act provided for mandatory binding arbitration. As amended, however, the Port Authority Act makes arbitration discretionary with the parties. Section 3(k), 55 P.S. § 563.2(k), requires the parties to submit the labor dispute to final and binding interest arbitration only when PAT has sought injunctive relief from the courts.

Local 85 argues that the Commonwealth Court had only two options under Section 3(k) of the Port Authority Act: (1) refuse to issue an injunction and allow the strike to continue; or (2) issue an injunction and direct that the labor dispute be submitted to binding arbitration. It contends that any other relief would be inappropriate because the Legislature had determined that binding arbitration is the appropriate and ultimate method of resolving these disputes. The legislative scheme was crafted, however, with the limitation that PAT would be the only party that could seek injunctive relief. It does not necessarily follow that the Legislature intended

binding arbitration to be mandatory when individuals or entities other than PAT bring an action to enjoin the strike. Under the Public Employe Relations Act, for example, the Legislature provided a right to strike for public employees, but did not require their labor disputes to be submitted to binding arbitration upon issuance of a court order enjoining the strike. 43 P.S. § 1101.1003.

In the absence of a legislative directive, we conclude that in this instance the soundest approach is to treat the employees of PAT consistently with public employees governed by the Public Employe Relations Act. Local 85 argues that it would be unfair to deprive its members of the right to strike without submitting the dispute to binding arbitration, and that it will be left without a method by which labor disputes can be resolved. It is clear that Local 85 is not without a remedy. Local 85's remedy is with the courts of this Commonwealth, as is other public employees.

Accordingly, the adjudication and decree of the Commonwealth Court is affirmed.

McDERMOTT, former Justice, did not participate in the decision of this case.

NIX, C.J., files a dissenting opinion.

LARSEN, J., files a dissenting opinion in which NIX, C.J., joins in parts I, II and III.

NIX, Chief Justice, dissenting.

I join in Parts I, II and III of the dissenting opinion authored by Mr. Justice Larsen and, therefore, agree with the result reached therein.

LARSEN, Justice, dissenting.

I dissent.

## I.

I agree with the majority that the portion of Section 563.-2(k) of the Second Class County Port Authority Act (hereinaf-

ter Port Authority Act) which restricts standing to seek any relief in any court of this Commonwealth under subsection (k) to the Port Authority Transit (PAT) is invalid in that it violates Article I, Section 11 of the Pennsylvania Constitution. Article I, Section 11 provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

The last sentence of Section 563.2(k)—"No party, other than the authority, shall have any standing to seek any relief in any court of this Commonwealth under this [Section 563.2(k) ]"—is contrary to this constitutional mandate and, therefore, is null and void and of no effect. This constitutional infirmity however does not invalidate the rest of the statute which remains in full force and effect as the majority opinion tacitly acknowledges. Statutory Construction Act, 1 Pa.C.S. § 1925.

## II.

I strongly disagree, however, with the majority's conclusion that reasonable grounds existed for the equitable relief ordered by the Chancellor in this case. The Port Authority Act, as amended in 1986, provides that it is the duty of PAT and the Union to make every reasonable effort to settle all labor disputes by good faith collective bargaining. (55 P.S. § 563.-2(b)). The parties shall commence to bargain collectively at least one hundred days prior to the expiration of a collective bargaining agreement. (55 P.S. § 563.2(e)). The act also provides for binding arbitration with the consent of both parties (55 P.S. § 563.2(f)), and for fact-finding by a neutral fact-finder. (55 P.S. § 563.2(g)). If PAT and the Union do not accept the recommendations of the neutral fact-finder and do not mutually agree to submit to final and binding arbitration, the Union shall have the right to strike. (55 P.S. § 563.2(k)). Further, the Port Authority Act provides:

> [S]uch strike shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the

health, safety or welfare of the public: Provided, That such strike shall not be prohibited on the grounds that it creates a clear and present danger or threat to the health, safety or welfare of the public unless the court's order granting relief further mandates that both parties submit the labor dispute to final and binding interest arbitration by a board of arbitration under the provisions of this section. No party, other than [PAT], shall have any standing to seek any relief in any court of this Commonwealth under this subsection.

55 P.S. § 563.(k). Senior Judge Silvestri Silvestri of the Commonwealth Court, sitting as Chancellor, granted, *inter alia*, a permanent injunction enjoining appellant, Amalgamated Transit Union Local 85 (Union) and all of its members, from continuing the work stoppage initiated on March 16, 1992. The basis for the Chancellor's injunction which enjoined the Union's strike was summarized in his adjudication as follows:

> During the parade of thirty (30) witnesses presented by the City, testimony was elicited about the impact of the mass transit strike upon families, individuals, and businesses. Blind, epileptic, professional, student, and blue-collar witnesses testified about the effect of the lack of public transportation upon their lives. While the lack of such transportation is a matter of inconvenience for some, it is devastating to others. Renal, cancer and psychiatric patients are often unable to get to appropriate medical facilities for treatment. Emergency medical services are delayed in attempts to reach citizens in need. Citizens are endangering their safety by walking along public roads to get to work because other modes of transportation are unavailable. Residents have been forced to find alternate living accommodations with friends or family because of the inaccessibility to work, school or day care. From the testimony presented, the City has demonstrated the far-reaching effect the strike has had upon commercial, academic, medical and social institutions.

The Chancellor concluded:

> Thus, it is clear that a permanent injunction should issue to return the community to its status prior to March 16, 1992,

to ensure the safety and prevent immediate and irreparable harm to citizens, and to prevent further harm which would result by a denial of the requested relief.

All of the consequences of the strike described by the Chancellor in his adjudication are precisely the kinds of inconveniences, disruptions and hardships which are incident to and normally expected when a transit strike occurs in a major metropolitan area. For example, it is reasonable to expect that persons who rely on public transportation to go to work or school will walk along public roads to get to work or school during a mass transit strike. Also, it is a normal expectation that business will decline at retail stores which depend upon customers who use public transportation. None of the consequences described by the witnesses in this case can be said to be unexpected or unanticipated by the Legislature when it enacted legislation permitting the Union to strike. The courts and the legislature of this Commonwealth have recognized that certain inconveniences, disruptions and hardships are inherent in any strike and such inherent inconveniences, disruptions and hardships do not constitute a *clear and present danger* or threat to the health, safety or welfare of the public. *Armstrong School District v. Armstrong Education Association*, 5 Pa.Commw.Ct. 378, 291 A.2d 120 (1972).

"The 'clear' in that epigram is not limited to a threat indubitably etched in every microscopic detail. It includes that which is not speculative but real, not imagined but actual. The 'present' in the epigram is not restricted to the climatically imminent. It includes that which exists as contrasted with that which does not yet exist and that which has ceased to exist." ...

In this light, the determination of whether or not a strike presents a clear and present danger to the health, safety or welfare of the public must, therefore, require the court to find that the danger or threat is real or actual and that a strong likelihood exists that it will occur. *Additionally, it seems to us that the 'danger' or 'threat' concerned must not be one which is normally incident to a strike by public employees. By enacting [legislation] which authorizes*

*such strikes, the legislature may be understood to have indicated its willingness to accept certain inconveniences for such are inevitable, but it obviously intended to draw the line at those which pose a danger to the public health, safety or welfare.* (Emphasis supplied)

Id. 5 Pa.Commw.Ct. at 383–384, 291 A.2d at 123–124. Thus, the Chancellor erred in enjoining the strike in the instant case.

The majority herein, in reaching to uphold the Chancellor's injunction, does not rely only upon the inconveniences and disruptions of the public's normal daily routines as being sufficient to constitute a clear and present danger to the health, safety or welfare of the public, but combines the evidence of the daily inconveniences and disruptions with an unsupported declaration that ambulance, fire and police services and protection were severely hampered in concluding that there was a clear and present danger which justified an injunction. The majority states:

> The City's evidence did not simply establish the disruption of the witnesses' daily routines, however. The evidence established, inter alia, that public services, such as ambulance, fire and police services, were severely hampered by the increased traffic congestion resulting from the strike. To the extent that Local 85's argument suggests that the adverse effect on and threat to essential public services such as fire and police protection and emergency medical services are the ordinary and anticipated consequences of a transit strike, we are unpersuaded.

I must respectfully disagree with the majority's characterization of the evidence and the argument of the Union. There was scant evidence of disruption of the City's ability to provide adequate fire protection, police protection and emergency medical services because of the strike. As the Union points out in its brief, no testimony was offered by the City pertaining to the City's ability or inability to provide adequate fire and police protection as a result of the strike. (Brief of Union, p. 24) The only evidence offered by the City which directly pertained to the City's ability to provide emergency medical services was the testimony of Robert Kennedy, Chief of the

Bureau of Emergency Medical Services for the City of Pittsburgh Department of Public Safety. (R. pp. 342A-357A) Chief Kennedy testified that peak demand for emergency medical services is from 2:00 p.m. to 10:00 p.m. Monday through Saturday. (R. p. 346A) Mr. Kennedy testified that his Bureau did experience some difficulty in moving units to respond to calls. (R. p. 347A) He testified anecdotally to a report of a unit on the North Side of Pittsburgh dispatched to the South Side of Pittsburgh in response to a call at approximately 3:30 p.m. on March 30. Due to the volume of traffic at that time, the unit was unable to cross either the West End bridge or the Fort Duquesne bridge, even with its warning devices, and could not complete the call. (R. p. 347A) He testified as to "having some problem entering downtown [Pittsburgh] from the east due to congestion on Liberty Avenue"; "we are very often forced now to go long distances down Liberty Avenue into town opposing traffic." (R.P. 348A) Chief Kennedy stated that paramedics have reported to him that they were finding difficulty on secondary roads because of the presence of more traffic than usual on those roads. (R. p. 349A) The traffic conditions and delays described by Chief Kennedy are not dissimiliar to that which is encountered during busy traffic hours when traffic on a major thoroughfare (such as the Parkway East or Parkway West in Pittsburgh) is limited because of the resurfacing and/or repairs of such thoroughfare. The City offered no other evidence of its inability to provide adequate fire and police protection and emergency medical services. In its brief, (at p. 26) the Union candidly states:

The Union does not dispute the economic hardship and the inconvenience caused the public. The Union agrees that these hardships were imposed primarily on that segment of the population which is least able to withstand them, the young, the elderly and those suffering from physical or mental impairments.

Nevertheless, none of the evidence presented by the City constitutes evidence of a clear and present danger to the health, safety or welfare of the public under the standards

adopted in *Armstrong School District v. Armstrong Education Association, supra.* The disruptions of routine daily activities such as, travelling to and from employment, school, meetings, business appointments, personal appointments, medical appointments, social functions, etc. are indeed significant and often painful inconveniences to the public, particularly for the young and the elderly. These disruptions and inconveniences are inherent in the very nature of any mass transit strike in a metropolitan area. The majority, by elevating these disruptions and inconveniences to a clear and present danger or threat to the health, safety or welfare of the public renders the right to strike granted transit workers by the Port Authority Act illusory. I cannot conceive of a strike by transit employees which did not impact the public in the various ways described by the witnesses in this case. Surely, the disruptive effect of a mass transit strike upon the public is rightfully a matter for concern. In enacting the Port Authority Act, 55 P.S. § 551, et seq., however, the General Assembly weighed the competing interests which would be affected by legislation permitting Port Authority employees to strike and enacted legislation in favor of allowing such strikes. The majority's opinion in this case which makes it inevitable that all strikes by Port Authority employees will be enjoined upon petition renders the Legislature's action useless.

## III.

The Chancellor, in his order of April 10, 1992, granted an injunction which enjoins the Union and its members from continuing the work stoppage initiated on March 16, 1992 and directs that the union members return to work. The Chancellor further directed that, "Beginning on the 13th day of April 1992 at 10:00 o'clock A.M. and continuing each day thereafter until an agreement is effectuated, the duly authorized representatives of the Union and Port Authority shall meet with the court in its chambers at 614 Frick Building, 435 Grant Street, Pittsburgh, Pa. 15219, for the purpose of engaging in collective bargaining under the supervision of this court." The Chancellor did not order PAT and the Union to submit their labor

dispute to final and binding interest arbitration as required by the Port Authority Act which specifically provides, in relevant part, as follows:

[T]he employees shall have the right to strike ..., and such strike shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public: Provided, That *such strike shall not be prohibited* on the grounds that it creates a clear and present danger or threat to the health, safety or welfare of the public *unless the court's order granting relief further mandates that both parties submit the labor dispute to final and binding interest arbitration* by a board of arbitration under the provisions of this section. (emphasis supplied)

55 P.S. § 563.2(k) The statute is unmistakably clear. A court has no authority to prohibit a strike even when it finds that the strike presents a clear and present danger to the health, safety and welfare of the public unless it simultaneously orders the parties to binding arbitration. Thus, even if it can be said that the Chancellor did not abuse his discretion in granting an injunction and that the evidence of record supports his findings (which I, of course, dispute), it is clear that the Chancellor erred in ordering court supervised collectively bargaining instead of final and binding interest arbitration as mandated by the legislature. When a strike is lawfully enjoined under the provisions of the Port Authority Act, the labor dispute *must* be resolved by binding arbitration and by no other means. 55 P.S. § 563.2(k) The majority's conclusion that binding arbitration is mandatory only when *PAT* brings an action to enjoin a strike is contrary to the plain words of the statute and the clear intent of the legislature. Furthermore, the majority reaches that erroneous conclusion by fallacious logic. That is, the majority, on the one hand strikes down as unconstitutional the last sentence of Section 563.2(k) which provides, "No party, other than the authority, shall have any standing to seek any relief in any court of this Commonwealth under this [Section 563.2(k) ]", and then uses that very same sentence to support its refusal to apply the valid and constitutional portion of Section 563.2(k) that mandates, with-

out exception, final and binding interest arbitration anytime and everytime an injunction enjoining a strike is issued. The majority cannot have it both ways.

## IV.

Next, the Chancellor's order prohibiting public statements on the continuing court supervised negotiations violates Article I, Section 11 of the Pennsylvania Constitution which provides, inter alia, that "All courts shall be open". Additionally, the Chancellor's order constitutes an unconstitutional prior restraint and is violative of Article I, Section 7 of the Pennsylvania Constitution.

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or *any branch of government*, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.... (Emphasis supplied)

See *Commonwealth v. French*, —— Pa. ——, 611 A.2d 175 (1992). The Commonwealth Court's order which mandates court supervised collective bargaining sessions declares that such sessions shall be a continuation of the public hearing which began on April 7, 1992. By that order, the court has designated the bargaining sessions as proceedings of the judicial branch of government. Thus, the provisions of Article I, Section 7 of the Pennsylvania Constitution specifically forbid the prohibition on public statements imposed by the court's order.

Further, the Commonwealth Court's order constitutes a prior restraint in violation of First Amendment of the United States Constitution.

> " 'Any system of prior restraints of expression comes to this [or any] Court bearing a heavy presumption against its constitutional validity,' "the State" ' carries a heavy burden of showing justification for the imposition of such a restraint.' " *New York Times Co. v. United States*, 403 U.S.

713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed 2d 822, 824–825 (1971) (per curiam, quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1, 5–6 (1971). See Also: *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). As a general rule, the press is free to publish that which transpires during a public hearing and cannot be subjected to prior restraint with respect thereto. *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 311, 97 S.Ct. 1045, 1047, 51 L.Ed 2d 355, 358 (1977). That which occurs in a public courtroom is public property. *Sheppard v. Maxwell*, 384 U.S. 333, 350, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 613 (1966); *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546, 1551 (1947). Absent a state interest of the highest order, the state may not prevent or punish the publication of truthful information of public significance which has been lawfully obtained. *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 101–102, 99 S.Ct. 2667, 2670, 61 L.Ed 2d 399, 404 (1979). '[E]ven a short-lived "gag" order in a case of widespread concern to the community constitutes a substantial prior restraint and causes irreparable injury to First Amendment interests as long as it remains in effect.' *Capital Cities Media, Inc. v. Toole* ... 463 U.S. [1303] at [1304], 103 S.Ct. [3524] at 3525, 77 L.Ed 2d [1284] at 1287 [ (1983) ].

*Commonwealth v. Genovese*, 337 Pa.Super.Ct. 485, 493, 487 A.2d 364, 368 (1985).

The majority declined to address this issue for the reason that "neither of the parties has asserted that the Commonwealth Court has denied it authorization to make any public statements upon request." I believe that the ostrich position adopted by the majority with respect to the restraint on speech ordered by the Chancellor is erroneous. The mere fact that the parties must obtain the Commonwealth Court's permission to make or publish a statement is an unlawful prior restraint and violates Article I, Section 7 of the Pennsylvania Constitution and the First Amendment to the United States Constitution.

## V.

Finally, the majority's opinion in this case renders the Port Authority Transit workers as the only public employees in the Commonwealth of Pennsylvania who are effectively deprived of the right to strike and have no right to binding arbitration. For example, Act 195, the Public Employe Relations Act, 43 P.S. § 1101.101, et seq. provides public employees, such as school teachers, with the right to strike after the required collective bargaining processes have been used and exhausted. 43 P.S. § 1101.1003. Those public employees who, under Act 195, are excepted from the right to strike, such as prison guards, mental hospital guards and court personnel, have their labor disputes resolved by binding arbitration. 43 P.S. § 1101.805. Procedures involving collective bargaining by policemen and firemen are mandated by Act 111, 43 P.S. § 217.1, et seq. Act 111 provides that labor disputes which have reached an impasse in bargaining shall be resolved by binding arbitration. 43 P.S. § 217.4.

Under the majority's holding today that the inconveniences and hardships resulting from the transit strike constitute a clear and present danger to the health, safety and welfare of the public, and its construction of Section 563.2(k) of the Port Authority Act, the Port Authority Transit employees are left naked. They are effectively deprived of the right to strike and stripped of their right to binding arbitration. Now, there is no incentive for the Port Authority to bargain in good faith to avert a strike. The majority's opinion encourages the Port Authority to hold fast to its bargaining position, whether it be reasonable or unreasonable, and wait until the transit workers call for a work stoppage and go out on strike. As soon as a strike impacts upon the the public with the inconveniences, delays and hardships that are inherent in such a work stoppage, the Port Authority is further encouraged to do nothing and wait for political pressure to build and cause a third party in interest, such as the City of Pittsburgh, to seek an injunction which has the twofold result of curtailing the strike and emasculating the transit workers' statutory right to final and binding interest arbitration. It is beyond all possibility that

the Legislature intended such a result. The majority, in singling out these public employees as a unique class effectively unable to strike and deprived of the right of final and binding interest arbitration, violates the constitutional mandate of equal protection guaranteed by Article I, § 26, Pennsylvania Constitution and the 14th Amendment of the United States Constitution.

For all of the above reasons, I dissent.

NIX, C.J., joins in parts I, II, and III of this dissenting opinion.