HIGHMARK INC., successor in interest to Medical Service Association of Pennsylvania d/b/a Pennsylvania Blue Shield, and Blue Cross Blue Shield Association, Appellants,

v.

HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVA-NIA d/b/a Blue Cross of Northeastern Pennsylvania and HMO of Northeast-ern Pennsylvania d/b/a First Priority Health, Appellees (Four Cases).

Appeal of Blue Cross Blue Shield Association.

Superior Court of Pennsylvania.

Argued May 15, 2001.
Filed Sept. 21, 2001.
Reargument Denied Nov. 30, 2001.

James M. Amend, Chicago, IL, for Blue Cross Blue Shield Association.

Patrick J. O'Connor, Philadelphia, for Hospital Service Association of Northeastern Pennsylvania, appellee.

Joseph Friedman, Pittsburgh, for Highmark, Inc.

Before: CAVANAUGH, STEVENS, and TAMILIA, JJ.

CAVANAUGH, J.

¶ 1 This case involves Blue Cross Blue Shield Association (Association) and one of its licensees attempting to compel a second licensee to arbitrate a dispute between the licensees pursuant to a provision of an agreement between Association and the second licensee requiring that all such disputes be submitted to arbitration. We hold that the agreement contained a valid arbitration provision, that the present dispute falls within the scope of that provision, and that waiver and other defenses to arbitration are properly before the arbitrator rather than this court.

¶ 2 Highmark Inc. and Association appeal the November 12, 1999, and December 10, 1999, orders denying the petition to compel arbitration and the motions for reconsideration. We reverse.

¶ 3 Highmark was formed through the December 6, 1996, consolidation of Veritus Inc., which operated as Blue Cross of Western Pennsylvania, and Medical Service Association of Pennsylvania, which operated as Pennsylvania Blue Shield (Blue Shield). Historically, Veritus supplied hospitalization coverage while Blue Shield provided coverage for doctors' services. Highmark is a member of Association, which owns and licenses the Blue Cross and Blue Shield names. The license agreements with Association require, with limited exception, that disputes between licensees be submitted to arbitration. Highmark's license to use the Blue Cross name is restricted to 29 western Pennsyl-

vania counties. It has the exclusive right to use the Blue Shield name throughout all of Pennsylvania.

¶ 4 Hospital Service Association of Northeastern Pennsylvania, which operates as Blue Cross of Northeastern Pennsylvania (BCNEPA), is licensed by Association to use the Blue Cross name in 13 northeastern Pennsylvania counties. BCNEPA traditionally provided hospitalization coverage. HMO of Northeastern Pennsylvania, which operates as First Priority Health (First Priority), is a wholly owned subsidiary of BCNEPA and is a party to an affiliate license agreement with Association which entitles it to the same service area as BCNEPA. Pursuant to a January 1, 1976, joint operating agreement between Blue Shield and BCNEPA, BCNEPA markets health care plans offered by Highmark and BCNEPA as a single package in BCNEPA's service area.

¶ 5 In the mid–1980s, Blue Shield and BCNEPA discussed establishing a jointly owned Health Maintenance Organization (HMO) in BCNEPA's service area. Since they were unable to come to an agreement as to the percentages of ownership, BCNEPA founded and began operating First Priority in 1987, as a wholly owned subsidiary. According to Highmark, BCNEPA did not actively promote First Priority's HMO until about 1992. By 1993, BCNEPA allegedly provided incentives to their sales agents to sell First Priority coverage instead of traditional BCNEPA/Blue Shield coverage.

¶ 6 In December of 1993, Blue Shield sent a letter to BCNEPA stating its concern that BCNEPA's promotion of HMO coverage in which Blue Shield had no interest to the detriment of traditional coverage may be a breach of BCNEPA's duty as its agent under the January 1, 1976, joint operating agreement. BCNEPA and Blue Shield recognized that the situation could be ameliorated if Blue Shield acquired an equity interest in First Priority. In 1995, BCNEPA and Blue Shield agreed to negotiate in good faith for the acquisition of stock by Blue Shield in First Priority. In February of 1996, BCNEPA rejected Blue Shield's offer to purchase a 50% interest.

¶ 7 In May of 1997, after the formation of Highmark through the consolidation of Blue Shield and Veritus, Highmark sought arbitration pursuant to Association's license agreement with BCNEPA. Highmark alleged that BCNEPA's promotion of First Priority's HMO coverage violated the January 1, 1976, joint operating agreement. BCNEPA responded that Association's license agreement did not require arbitration of the matter.

¶ 8 On October 3, 1997, Highmark filed a complaint and a petition to compel arbitration in Dauphin County against BCNEPA and First Priority. On the same day, BCNEPA and First Priority filed an action in Luzerne County seeking a declaration that they may market and sell First Priority's HMO products under the January 1, 1976, joint operating agreement. The cases were consolidated in Dauphin County. Association intervened as a party to the license agreement and asserted that the dispute was subject to arbitration. The lower court denied the petition to compel arbitration on November 12, 1999. On December 10, 1999, it denied Highmark and Association's motions for reconsideration. On appeal, our jurisdiction over the denial of the petition to compel arbitration arises from 42 Pa.C.S.A. § 7320(a)(1).

¶ 9 Highmark raises the following issues on appeal:

1. Is the dispute between Appellant Highmark Inc. and Appellee subject to mandatory arbitration pursuant to their

License Agreements with the Blue Cross and Blue Shield Association?

2. Did Appellant Highmark Inc. waive its right to invoke the mandatory arbitration provision of the applicable License Agreements with the Blue Cross and Blue Shield Association?

3. Did the lower court exceed its authority and commit[ ] errors of law in reaching factual conclusions based upon an incomplete record and in issuing its Order of December 10, 1999?

¶ 10 In addition, Association raises a number of overlapping issues:

4. Whether the lower court erred in finding that the dispute between Highmark and BCNEPA/First Priority is not within the scope of the arbitration provisions in the license agreements to which they are parties and in thereby denying and dismissing the complaint and petition to compel arbitration?

5. Whether the lower court erred in finding that the association has no right or need to compel arbitration pursuant to the arbitration provisions contained in the license agreements?

6. Whether the lower court lacked jurisdiction to enter the order dated December 10, 1999 insofar as it attempts to amend its prior order dated November 12, 1999?

▇▇▇▇ ¶ 11 Our standard of review for an appeal from a court sitting in equity is as follows: "A chancellor's findings of fact will not be disturbed absent an abuse of discretion, a capricious disbelief of the evidence, or a lack of evidentiary support on the record for the findings. A chancellor's conclusions of law are subject to stricter scrutiny." *Lilly v. Markvan*, 563 Pa. 553, 763 A.2d 370, 372 (2000) (quoting *Masloff v. Port Auth. of Allegheny County*, 531 Pa. 416, 613 A.2d 1186, 1188 (1992)).

¶ 12 As a threshold issue, we must determine what law applies to the determination of whether the chancellor should have compelled arbitration of the dispute between Highmark and BCNEPA. While the chancellor applied Pennsylvania law, appellants argue that federal law or that Illinois law, as per the choice of law provision in BCNEPA's license agreement, apply.

▇▇▇▇ ¶ 13 "In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary." *Keystone Aerial Surveys, Inc. v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 2001 PA Super 139, ¶ 32, 777 A.2d 84 (quoting *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa.Super.2000), *appeal denied*, 2001 WL 10367, 2001 Pa. Lexis 41 (Pa. Jan. 4, 2001)). The parties do not argue and we do not find that the choice of law affects the outcome in this case. Federal, Pennsylvania, and Illinois law all favor arbitration, *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Smith v. Cumberland Group, Ltd.*, 455 Pa.Super. 276, 687 A.2d 1167, 1171 (1997); *Zimmerman v. Ill. Farmers Ins. Co.*, 317 Ill.App.3d 360, 251 Ill.Dec. 57, 739 N.E.2d 990, 994–95 (2000), and disfavor finding waiver of the right of arbitration, *Klein v. Boyd*, 949 F.Supp. 286, 289 (E.D.Pa.1996); *Goral v. Fox Ridge, Inc.*, 453 Pa.Super. 316, 683 A.2d 931, 933 (1996); *Schroeder Murchie Laya Assocs. v. 1000 W. Lofts, LLC*, 319 Ill. App.3d 1089, 253 Ill.Dec. 846, 746 N.E.2d 294, 300 (2001). Since the various laws do not differ in ways that are material to the present case, we apply Pennsylvania law. *Keystone*, 2001 PA Super 139, ¶ 32, 777 A.2d 84.

▇▇▇▇ ¶ 14 Appellants argue that BCNEPA agreed to arbitrate all disputes

with Association's licensees when it signed its license agreement with Association and that the chancellor erred in finding that the instant dispute was not within the scope of the arbitration provision in that agreement. The chancellor's "conclusion as to whether the parties have agreed to arbitrate is reviewable by this Court." *Midomo Co. v. Presbyterian Hous. Dev. Co.*, 739 A.2d 180, 187 (Pa.Super.1999) (quoting *Smith*, 687 A.2d at 1171). "Our review is plenary, as it is with any review of questions of law." *Id. See also Shadduck v. Christopher J. Kaclik, Inc.*, 713 A.2d 635, 637 (Pa.Super.1998) ("[T]he issue of whether a particular dispute falls within a contractual arbitration provision is a matter of law for the court to decide.").

▮ ¶ 15 "When one party to an agreement seeks to prevent another from proceeding to arbitration, judicial inquiry is limited to determining (1) whether a valid agreement to arbitrate exists between the parties and, if so, (2) whether the dispute involved is within the scope of the arbitration provision." *Midomo*, 739 A.2d at 186 (quoting *Smith*, 687 A.2d at 1171). "[I]f a valid arbitration agreement exists between the parties and appellant['s] claim is within the scope of the agreement, the controversy must be submitted to arbitration." *Goldstein v. Depository Trust*, 717 A.2d 1063, 1066 (Pa.Super.1998) (quoting *Messa v. State Farm Ins. Co.*, 433 Pa.Super. 594, 641 A.2d 1167, 1170 (1994)).

▮ ¶ 16 In deciding whether BCNEPA has agreed to arbitrate, we must apply the following:

(1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive as-

surance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute.

*Midomo*, 739 A.2d at 190 (quoting *Emlenton Area Mun. Auth. v. Miles*, 378 Pa.Super. 303, 548 A.2d 623, 625 (1988)). "To resolve this tension, courts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties." *Id.* at 190–91. The proper interpretation of a contract

is a question of law and this Court's scope of review is plenary. We need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.

*Liddle v. Scholze*, 768 A.2d 1183, 1185 (Pa.Super.2001) (citations omitted).

¶ 17 The license agreement between BCNEPA and Association states:

Except as to the termination of a Plan's License Agreement or the merger of two or more Plans, disputes as to noncompliance, and all other disputes between or among [Association], the Plan, other Plans and/or Controlled Affiliates, shall be submitted promptly to mediation and mandatory dispute resolution pursuant to the rules and regulations of [Association]. . . .

Highmark's Supplemental Brief in Support of Motion to Compel Arbitration, Exhibit 9, License agreement between BCNEPA and Association of 1/1/91, at 5. "[T]he Plan" refers to BCNEPA and "other Plans" refer to other licensees, *i.e.*, Highmark.

¶ 18 The parties do not dispute that this license agreement is a valid agreement concerning arbitration. While the agreement is between BCNEPA and Association, not between BCNEPA and Highmark, Highmark is an intended third party beneficiary of the agreement. *See Gregg v. Lindsay*, 437 Pa.Super. 206, 649 A.2d 935, 937 (1994) (stating that one is a third party beneficiary when the recognition of the beneficiary's right "effectuate[s] the intention of the parties" and "the circumstances indicate that the promisee intend[ed] to give the beneficiary the benefit of the promised performance"). Highmark may, therefore, enforce the arbitration agreement. *See Miller v. Allstate Ins. Co.*, 763 A.2d 401, 405 n. 1 (Pa.Super.2000) (stating that "a third party beneficiary's rights and limitations in a contract are the same as those of the original contracting parties"). Moreover, Association itself intervened in the dispute. While Association takes no stance on the underlying merits, it seeks to assert that the dispute should go to arbitration. Since there is a valid agreement concerning arbitration applicable to the parties in this case, the only question remaining is whether the present dispute is within the scope of the arbitration provision. *Smith*, 687 A.2d at 1171.

¶ 19 The chancellor reasoned that because the dispute arose out of BCNEPA's alleged violation of the January 1, 1976, joint operating agreement, the dispute resolution provisions of that agreement rather than BCNEPA's license agreement with Association applied. The joint operating agreement states that "[a]ny question and/or dispute which may arise from the operation of this Agreement shall be referred to the chief executive officers of [BCNEPA] and Blue Shield for resolution." Highmark's Supplemental Brief in Support of Motion to Compel Arbitration, Exhibit 15, *Joint Operating Agreement between Pennsylvania Blue Shield and Blue Cross of Northeastern Pennsylvania* at 2 (Jan. 1, 1976).[1] The CEOs were unable on their own, however, to ameliorate the situation. Still, the agreement between BCNEPA and Blue Shield cannot work to undermine BCNEPA's obligations, including its duty to arbitrate pursuant to its license agreement. The question, therefore, continues to be whether the dispute between BCNEPA and Blue Shield is within the scope of the arbitration provision of BCNEPA's license agreement. *Smith*, 687 A.2d at 1171.

¶ 20 The chancellor also found that BCNEPA's license agreement did not apply to this dispute because it only required arbitration of disputes arising from the license agreement itself. While the agreement references "disputes as to noncompliance, and all other disputes," the chancellor found that "this provision is looking at 'noncompliance', meaning noncompliance with the terms of the License Agreements. The phrase, 'and all other disputes', similarly refers to what is in the License Agreements." Trial Count Opinion, 6/23/00, at 15. However, the agreement contains no such limiting language.

¶ 21 Likewise, Association's arbitration rules state as follows:

The Plans and [Association] desire to utilize Mediation and Mandatory Dispute Resolution ("MMDR") to avoid ex-

---

1. Association's rules and regulations applying to arbitration which are referenced in the arbitration provision of the license agreement likewise state that the CEO of the complaining party must attempt in good faith to resolve the dispute before arbitration. High-

mark's Supplemental Brief in Support of Motion to Compel Arbitration, Exhibit 9, License agreement between BCNEPA and Association of 1/1/91, Exhibit 5, *Mediation and Mandatory Dispute Resolution (MMDR) Rules* at 1.

pensive and time-consuming litigation that may otherwise occur in the federal and state judicial systems. . . . Except as otherwise provided in the License Agreements, the Plans, their Controlled Affiliates and [Association] agree to submit all disputes to MMDR pursuant to these Rules and in lieu of litigation.

Highmark's Supplemental Brief in Support of Motion to Compel Arbitration, Exhibit 9, License agreement between BCNEPA and Association of 1/1/91, Exhibit 5, *Mediation and Mandatory Dispute Resolution (MMDR) Rules* at 1. The rules in the above quoted section as well as elsewhere refer to the arbitration of all disputes without any limiting language. Moreover, the rules express the collective policy of Association and its licensees to avoid costly litigation.

¶ 22 Association's policy in including arbitration provisions in its license agreements is clear. It desires a low cost, low profile, and uniform means for resolving the disputes of its numerous independent licensees. Litigation raises the cost and the price of health insurance and may result in negative publicity. These factors affect Association and the licensees as a whole since they share a name and a reputation. Association has made it clear that they take no position as to the ultimate merits of the underlying dispute. However, arbitration in a private forum is a means to maintain affordability and privacy as well as achieve a more uniform result.

¶ 23 Because the chancellor's strained and conclusory reading of "and all other disputes" is not supported by the record, *Lilly,* 763 A.2d at 372, because we are to favor arbitration agreements, *Smith,* 687 A.2d at 1171, and because our review is plenary, *Liddle,* 768 A.2d at 1185; *Midomo,* 739 A.2d at 187, we find that the

arbitration provision in the agreement applies generally to all disputes, including the instant controversy.

¶ 24 Appellees argue, however, that they should not be compelled to arbitrate since, according to the finding of the chancellor, Highmark waived its arbitration rights due to its delay in seeking arbitration.

[T]he right to enforce an arbitration clause can be waived. A waiver of the right to proceed to arbitration may be expressly stated, or it may be inferred from "a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." [*Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs.,* 416 Pa.Super. 45, 610 A.2d 499, 501 (1992) ]. Waiver "should not be lightly inferred[,] and unless one's conduct has gained him an undue advantage or resulted in prejudice to another he should not be held to have relinquished the right." [*Kwalick v. Bosacco,* 329 Pa.Super. 235, 478 A.2d 50, 52 (1984) ].

*Goral,* 683 A.2d at 933 (citations omitted).

¶ 25 While a party can waive the right of arbitration, "the question of the timeliness of a demand for arbitration 'is not of interpretation of the agreement and not one of the existence or scope of the arbitration provision; it is thus outside the bounds of our review and its resolution must be left to arbitration.' " *Lincoln Univ. of Commonwealth Sys. of Higher Educ. v. Lincoln Univ. Chapter of Am. Ass'n of Univ. Professors,* 467 Pa. 112, 354 A.2d 576, 582 n. 11 (1976) (quoting *Muhlenberg Township Sch. Dist. Auth. v. Pa. Fortunato Constr. Co.,* 460 Pa. 260, 333

A.2d 184, 187 (1975)).[2]

■ ¶ 26 While we hold that the issue of timeliness is for the arbitrator, we would not have found that Highmark waived its right to arbitration even if we evaluated that issue on the merits. The chancellor noted that Blue Shield failed to object to the formation of First Priority in the mid–1980s and that Highmark, successor to Blue Shield, only sought arbitration years after Blue Shield began losing business to First Priority. The chancellor found that the delay of Blue Shield prejudiced BCNEPA since it has now invested significant resources in First Priority. Therefore, the chancellor determined that Highmark waived its right to arbitration.

¶ 27 Highmark does not contest the formation of First Priority, however. Instead, it claims that BCNEPA violated its duty as its agent under the joint operating agreement when it began promoting First Priority's HMO to the detriment of the traditional coverage it offered. It is of little consequence, therefore, that Blue Shield failed to object to the formation of First Priority. Likewise, it is unclear in what way BCNEPA's investment in First Priority would be prejudiced by resolving, in arbitration, whether BCNEPA's promotion of First Priority violated their joint operating agreement.

¶ 28 Blue Shield began to state their opposition to BCNEPA's incentive structure after BCNEPA allegedly began to give special incentives to entice customers to subscribe to First Priority's HMO. The chancellor correctly found that Blue Shield did not file a complaint in arbitration at that time. However, Blue Shield and BCNEPA were actively engaged in trying to resolve the situation. Indeed, the parties negotiated over giving Blue Shield an equity interest in First Priority in order to achieve a solution. Promptly after negotiations broke down, Highmark sought arbitration. We would find, therefore, that Highmark did not waive its right to arbitrate the dispute over BCNEPA's promotion of First Priority when it sought arbitration promptly after other efforts aimed at resolving the situation failed.

■ ¶ 29 Appellees also argue that they should not be compelled to arbitrate since there was no arbitrable dispute. Indeed, the chancellor found that there was no arbitrable dispute involving the ownership and operation of First Priority. Order, 12/10/99, at 2. Appellees' defense, however, does not involve the existence, interpretation, or scope of the arbitration agreement. Instead, appellees assert that there is no dispute since Highmark has no basis for relief on the merits of the underlying claims. Despite the chancellor's finding, this defense to arbitration must be left to the arbitrator. *Lincoln Univ.*, 354 A.2d at 582 n. 11.

■ ¶ 30 Appellees final defense to arbitration is that the dispute arose before the license agreement required arbitration. Appellees' defense is predicated on the notion that the dispute involves the creation and initial operation of First Priority's HMO, predating the arbitration provision of the license agreement, rather than the way that the HMO has been promoted since that time. Since appellees' defense does not involve the existence, interpretation, or scope of the arbitration agreement but rather the nature of the underlying dispute, this defense, too, belongs to the arbitrator rather than this court. *Id.*

---

**2.** *But see Amerimar,* 610 A.2d at 502 (stating that the court may determine whether the right to arbitration has been waived due to delay). We decline to follow *Amerimar* since it stands in opposition to the decisions of our supreme court, cited above, as well as our decision in *Kwalick,* which *Amerimar* cited as authority for the proposition in question.

¶ 31 Because the instant dispute falls within the scope of a valid arbitration agreement and because appellees' defenses should have been left to the arbitrator, we find that the chancellor erred in failing to order arbitration. We reverse the orders below and order the parties to proceed to arbitration.

¶ 32 Order reversed.

¶ 33 Judge STEVENS files a Dissenting Opinion.

STEVENS, J., Dissenting.

¶ 1 I conclude that the lower court properly denied Highmark's petition to compel arbitration and the motion for reconsideration with regard thereto. Specifically, I conclude that no arbitrable dispute exists, and, therefore, I respectfully dissent.

¶ 2 As the Majority correctly indicates, when one party to an agreement seeks to prevent another from proceeding to arbitration, this Court must determine whether a valid agreement to arbitrate exists between the parties and, if so, whether the dispute involved is within the scope of the arbitration provision. *Midomo Co. v. Presbyterian Housing Dev. Co.*, 739 A.2d 180 (Pa.Super.1999). Where it is clear that no dispute exists or the agreement involved is not susceptible of an interpretation that covers a dispute, arbitration is properly denied. *Canter's Pharmacy, Inc. v. Elizabeth Assoc.*, 396 Pa.Super. 505, 578 A.2d 1326 (1990). "Arbitration, by its very nature, presupposes the existence of a dispute and an ability to decide in favor of one party and against another. [Where this does not exist,] arbitration . . . would be futile." *Id.* at 1330 (citation omitted).

¶ 3 In the case *sub judice*, Appellees do not dispute that an agreement to arbitrate

exists. That is, the license agreement between Appellees and the Association indicates that all disputes between or among the Association, the plan, other plans and/or controlled affiliates must be submitted to arbitration. However, Appellees contend that Highmark is in no position to compel Appellees to sell Highmark an ownership interest in First Priority, and, therefore, there is no dispute to arbitrate. I agree with Appellees' assertion.

¶ 4 Highmark has failed to point to any contract whereby Appellees mutually agreed to sell Highmark an ownership interest in First Priority, but failed to do so. While the parties discussed the possibility of Highmark buying an ownership interest, no definite agreement was ever reached. The concept is simple: Appellees cannot be coerced into selling Highmark an ownership interest in First Priority absent a binding contract directing such a sell. I note that the January 1, 1976 joint operating agreement does not directly limit Appellees' ability to operate First Priority and that Highmark exclusively operates Healthguard, an HMO providing services in central Pennsylvania.

¶ 5 Since Appellees cannot be compelled to sell Highmark an ownership interest in First Priority, there is no dispute to arbitrate. As such, I would affirm, and, therefore, I respectfully dissent.[3]

---

3. I also note that the Majority concludes that waiver is a question for the arbitrator yet then makes a finding that the waiver claim is mer-

itless. In any event, I would not reach the waiver issue as noted *supra*.