KEYSTONE AERIAL SURVEYS,
INC., Appellant, (at 2307)

v.

PENNSYLVANIA PROPERTY & CA-
SUALTY INSURANCE GUARAN-
TY ASSOCIATION, Appellee.

Keystone Aerial Surveys,
Inc., Appellant,

v.

Pennsylvania Property & Casualty
Insurance Guaranty Association,
Appellee,

v.

Marisol Campbell, Vanessa Campbell
and Melva Campbell, Individually and
as natural mother and next friend of
Penelope Campbell and Nakita Camp-
bell, Minors, Appellants. (at 2469)

Superior Court of Pennsylvania.

Argued Feb. 28, 2001.
Filed May 3, 2001.
Reargument Denied July 10, 2001.

John K. Weston, Philadelphia, for Keystone Aerial Surveys.

Rand P. Nolen, Houston, TX, for Campbell.

Lise Luborsky, Philadelphia, Pennsylvania Property and Casualty, appellee.

Before Del SOLE, P.J., EAKIN and LALLY–GREEN, JJ.

LALLY–GREEN, J.:

¶ 1 Appellants, Keystone Aerial Surveys, Inc. (Keystone), *et al.*, appeal from the order dated June 27, 2000, granting summary judgment to Pennsylvania Property and Casualty Insurance Guaranty Association (PIGA). In this case of first impression, we are asked to interpret § 991.1803(b)(1)(i)(B) of the Pennsylvania Insurance Guaranty Association Act (the Act).[1] Appellants argue that this section allows each of five plaintiffs in an underlying wrongful death case to recover $300,000 from PIGA. In contrast, PIGA argues that this section caps the recovery for all five plaintiffs to $300,000 in the aggregate. The trial court found in favor of PIGA. We reverse and remand for further proceedings.

¶ 2 The facts and procedural history of the case are as follows.[2] Thomas Campbell, a Texas resident, was a passenger in an airplane which crashed near Battle Mountain, Nevada, on May 28, 1994. Mr. Campbell's wife and four surviving children (collectively, the Campbells) are all residents of Texas. Keystone, a Pennsylvania corporation, owned, maintained, operated, and controlled the airplane.

¶ 3 In September 1994, the Campbells filed a complaint against Keystone in the United States District Court for the Southern District of Texas.[3] The complaint set forth claims for: (1) wrongful death and survival under the Texas Wrongful Death Act, Tex. Civ. P. Rev.Code § 71.001 *et seq.*; (2) negligence; (3) gross negligence; and (4) in the alternative, a workers' compensation claim under the Pennsylvania Workers' Compensation Act, 77 P.S. § 1 *et seq.*[4]

¶ 4 Keystone was insured by American Eagle Insurance Company (American Eagle). The policy at issue was an aircraft insurance policy, which generally covered damage to aircraft and to passengers in the event of an accident. *See,* PIGA's Answer to Keystone's Motion for Summary Judgment, Exhibit C1. During the course of the Texas lawsuit, American Eagle was declared insolvent. PIGA, an insurance guaranty corporation, took the

---

1.  40 P.S. § 991.1801–§ 991.1820.

2.  The docket entries in this case are not numbered.

3.  Appellants note that, under the Texas wrongful death statute, each surviving family member holds an individual cause of action against the tortfeasor. Appellant's Brief at 8, *citing,* Tex. Civ. P. Rev.Code § 71.004(a); *Sowell v. Dresser Industries, Inc.,* 866 S.W.2d 803, 807 (Tex.App.1993). PIGA does not dispute this contention.

    The Second Amended Complaint of the Texas lawsuit was captioned as follows: "MELVA CAMPBELL, Individually and as the natural mother and next friend of MARISOL CAMPBELL, VANESSA CAMPBELL, THOMAS CAMPBELL, PENELOPE CAMPBELL, and NAKITA CAMPBELL, Minors; and as Personal Representative of THE ESTATE OF THOMAS CAMPBELL, Plaintiffs, v. KEYSTONE AERIAL SURVEYS, INC., AIRMAG SURVEYS, INC., and PRECISION SURVEYS, INC., Defendants."

    By the time final judgment was entered in the case, the caption read as follows: "MARISOL CAMPBELL, VANESSA CAMPBELL, and MELVA CAMPBELL Individually and as the natural mother and next friend of PENELOPE CAMPBELL and NAKITA CAMPBELL, Minors, [Plaintiffs] v. KEYSTONE AERIAL SURVEYS, INC. [Defendant]."

4.  This claim was asserted in the event that it was determined that Mr. Campbell was an employee of Keystone. No such determination has taken place.

place of the insolvent insurance company pursuant to 40 P.S. § 991.1803. Keystone and the Campbells settled the case for a total of $1,500,000; *i.e.*, $300,000 to each of the five surviving Campbells. This settlement was reflected in a final judgment issued by the United States District Court on October 15, 1998. The judgment reads, in relevant part, as follows:

### FINAL JUDGMENT

The parties announced to the Court that pursuant to the terms and limitations of the Settlement, Compromise and Release Agreement between the parties, the Plaintiffs herein should receive from Defendant, Keystone, the aggregate sum of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 ($1,500,000.00).

The Court, having heard and considered the evidence and argument of counsel concerning the dollar amount and the limitations on collection of same, and having considered the report of the Guardian Ad Litem [of Penelope Campbell and Nakita Campbell], is of the opinion and finds that the Settlement, Compromise and Release Agreement is fair and reasonable and should be adopted as the judgment of the Court....

The Court further finds that the gross recovery of the Plaintiffs' settlement should be apportioned in the following manner if funds aggregating to $1,500,000.00 are actually received which the Court finds to be fair and reasonable:

1. The sum of THREE HUNDRED THOUSAND AND NO/100 (300,-000.00) to be paid to Melva Campbell in her individual capacity;
2. The sum of THREE HUNDRED THOUSAND AND NO/100 (300,-000.00) to be paid to Marisol Campbell;
3. The sum of THREE HUNDRED THOUSAND AND NO/100 (300,-000.00) to be paid to Vanessa Campbell;
4. The sum of THREE HUNDRED THOUSAND AND NO/100 (300,-000.00) to be paid to Melva Campbell as Next Friend of Penelope Campbell or as directed by the Guardian Ad Litem, Darlene Payne Smith, in a manner that is in the best interests of the minor; and
5. The sum of THREE HUNDRED THOUSAND AND NO/100 (300,-000.00) to be paid to Melva Campbell as Next Friend of Nakita Campbell or as directed by the Guardian Ad Litem, Darlene Payne Smith, in a manner that is in the best interests of the minor.

It is further ORDERED, ADJUDICATED, AND DECREED that Defendant Keystone be discharged from all liability to Plaintiffs by reason of the incident described in the pleadings on file herein....

This is a final judgment and any relief not expressly granted herein is DENIED.

¶ 5 An initialed, handwritten addendum to the order reads as follows:

It is recognized by the Court that at the time this lawsuit was filed Keystone had $5 million in insurance coverage with American Eagle Insurance Company which was declared insolvent and placed into receivership on 12/8/99. At this time, the only primary insurance coverage available to Keystone was through the Pennsylvania Insurance Guaranty Association ("PIGA"). PIGA claims to have only $300,000 in coverage while Keystone and plaintiffs believe there is $1,500,000 in coverage. At mediation,

plaintiffs offered to settle this case within PIGA's policy limits. This offer was made on 10/6/98. As a result of PIGA's failure to recognize policy limits of $1,500,000 and their failure to settle the case for policy limits, Keystone was forced to enter into the settlement to protect its assets.

¶ 6 On April 14, 1999, Keystone filed a declaratory judgment action against PIGA.[5] Specifically, Keystone sought an order declaring that under § 991.1803(b)(1)(i)(B) of the Act, each of the Campbells was a separate "claimant" and, therefore, PIGA was required to pay five separate claims of $300,000, for a total of $1,500,000. PIGA took the position that it is liable only for $300,000 in the aggregate. The Campbells intervened in this action.

¶ 7 On July 22, 1999, PIGA filed a Motion for Summary Judgment. The trial court granted PIGA's motion in an order dated June 27, 2000. The order states, *inter alia,* that "any amount payable by [PIGA] is limited to a maximum of $300,000." Keystone and the Campbells filed appeals, which have been consolidated.

¶ 8 Appellants raise one issue on appeal: Does 40 P.S. § 991.1803(b)(1)(i)(B) provide for only a single claim for wrongful death and survival beneficiaries regardless of the number of potential claimants or beneficiaries?

Appellants' Brief at 2.

¶ 9 We first address whether the instant appeal is interlocutory. The trial court has suggested that the instant appeal is interlocutory and should be quashed because: (1) it did not dispose of all claims and all parties; (2) it was not expressly determined to be a final order; (3) it "was not a determination of finality"; and (4)

"hotly disputed issues of offset" against the $300,000 maximum are still outstanding. Trial Court Opinion, 9/14/2000, at 2.

■ ¶ 10 We do not agree that the appeal is interlocutory. Under Pa.R.A.P. 341(b)(2), "any order that is expressly defined as a final order by statute" is a final, appealable order. *Nationwide Mut. Ins. Co. v. Wickett,* 563 Pa. 595, 763 A.2d 813, 817 n. 6 (2000). Under 42 Pa.C.S.A. § 7532, any order declaring the "rights, status, and other legal relations" of the parties is expressly designated as a final order. *Id.* at 817. The trial court's order declared the legal relations of the parties by stating that PIGA's obligation to Appellants was limited to an aggregate maximum of $300,000 under the Act. Indeed, this order granted summary judgment to PIGA on the only issue presented by Keystone in its declaratory judgment action. Accordingly, the court's order was final and appealable. *See, id.* at 818.

■ ¶ 11 We now turn to the merits of the case. As noted above, Appellants filed a declaratory judgment action. "[T]he purpose of the Declaratory Judgments Act is to afford relief from uncertainty and insecurity with respect to legal rights, status and other relations." *Juban v. Schermer,* 751 A.2d 1190, 1193 (Pa.Super.2000) (citation omitted). Under the Declaratory Judgments Act, the trial court is empowered to declare the rights and obligations of the parties, even if no other relief is sought. *Id.* Ordinary summary judgment procedures are applicable to declaratory judgment actions. *See, Lititz Mut. Ins. Co. v. Steely,* 746 A.2d 607, 609 (Pa.Super.1999).

■ ¶ 12 Our standard of review for this appeal from the grant of summary

5. Declaratory Judgments Act, 42 Pa.C.S.A. § 7531 *et seq.*

judgment for PIGA in this declaratory judgment action is well settled.

In examining this matter, as with all summary judgment cases, we must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. In order to withstand a motion for summary judgment, a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Finally, we stress that summary judgment will be granted only in those cases which are clear and free from doubt. Our scope of review is plenary.

*Id.* (citation omitted).

¶ 13 The Act reads, in relevant part, as follows:

§ 991.1803. **Pennsylvania property and casualty insurance guaranty association**

(b) [PIGA] shall have the following powers and duties:

(1)(i) To be obligated to pay covered claims existing prior [to] the determination of the insolvency . . . . . Any obligation of the association to defend an insured shall cease upon the association's payment or tender of an amount equal to the lesser to the association's covered claim obligation or the applicable policy limit. Such obligation shall be satisfied by paying to the claimant an amount as follows:

(A) An amount not exceeding ten thousand ($10,000) dollars per policy for a covered claim for the return of unearned premium.

(B) **an amount not exceeding three hundred thousand ($300,000) dollars per claimant for all other covered claims.**

(2) To be deemed the insurer to the extent of its obligation on the covered claims and, to such extent, shall have all rights, duties and obligations of the insolvent insurer as if that insurer had not become insolvent.

40 P.S. § 991.1803(b)(1), (b)(2) (emphasis added).

¶ 14 "Covered claim" is defined in relevant part as follows:

(1) **an unpaid claim,** including one for unearned premiums, **submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy** to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article and:

(i) the claimant or insured is a resident of this Commonwealth at the time of the insured event: Provided, That for entities other than an individual, the residence of a claimant or insured is the state in which its principal place of business is located at the time of the insured event; or

(ii) the property from which the claim arises is permanently located in this Commonwealth.

40 P.S. § 991.1802.

¶ 15 Our task in this case of first impression is to identify who the claimant is under the Act. There are three possible candidates. First, Keystone could be considered the claimant insofar as Keystone is presenting one claim to PIGA for reimbursement in the aggregate amount of

$1,500,000.[6] Second, Thomas Campbell and his estate or personal representative could be the claimant. Third, each of the Campbells could be a claimant.

■■■ ¶ 16 We first observe that the term "claimant" is not defined in the Act. Thus, we turn to the rules of statutory interpretation and to relevant decisions by other courts. "Our goal in statutory interpretation is to 'ascertain and effectuate the intention of the General Assembly,' and we strive to give effect to all the provisions in a statute." *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 746 A.2d 1118, 1121 (Pa.Super.1999), *citing*, 1 Pa.C.S. § 1921(a).

> In so doing, we must begin with a presumption that our legislature did not intend any statutory language to exist as mere surplusage. Accordingly, whenever possible, courts must construe a statute so as to give effect to every word contained therein.
> When faced with a question of statutory interpretation, we must consider the language and spirit of the Statutory Construction Act, which states:
>> When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
>> (1) The occasion and necessity for the statute.
>> (2) The circumstances under which it was enacted.
>> (3) The mischief to be remedied.
>> (4) The object to be attained.
>> (5) The former law, if any, including other statutes upon the same or similar subjects.
>> (6) The consequences of a particular interpretation.
>> (7) The contemporaneous legislative history.
>> (8) Legislative and administrative interpretations of such statutes.
>
> 1 Pa.C.S.A. § 1921(c).

*Wiernik v. PHH U.S. Mortg. Corp.*, 736 A.2d 616, 621–622 (Pa.Super.1999), *appeal denied*, 561 Pa. 700, 751 A.2d 193 (2000).

■■■ ¶ 17 We begin with the plain language of the statute. "Claimant" is defined as "one who asserts a right or demand." Black's Law Dictionary (West Group, 1999). In other words, a "claimant" is a "person who makes a claim," which is "a demand for something that is due." Webster's Unabridged Dictionary (Random House, 1999). In the instant case, the Campbells asserted individual demands **against Keystone** to compensate for their losses arising from the accident. If Keystone were not insured, Keystone would be solely responsible for handling these claims. Because Keystone was insured, Keystone presented these claims to American Eagle for payment. Because American Eagle became insolvent, PIGA took the place of American Eagle. As such, Keystone presented the Campbells' claims to PIGA. Regardless of whether the claims are presented to an insurance company or to PIGA, these claims remain claims against the insured (Keystone). Since a claimant is a person who has enforceable rights against another, the plain meaning of the term "claimant" in the case before us is a person with enforceable rights against the insured, *i.e.*, someone with a covered claim.

¶ 18 We will now examine "the former law, if any, including other statutes upon the same or similar subjects." *Wiernik,*

---

**6.** We acknowledge that neither party is taking this position. This is clear from the briefs and was expressly stated at oral argument.

736 A.2d at 622. We observe that our definition of "claimant" comports with one case that addressed a similar issue, *H.K. Porter Company, Inc. v. Pennsylvania Insurance Guaranty Association*, 75 F.3d 137, 142 (3rd Cir.1996). The *Porter* Court held that where third parties are injured by an insured, the claimants are the injured third parties, not the insured.[7]

¶ 19 In *Porter*, the H.K. Porter Company (Porter) manufactured and sold various products containing asbestos. *Id.* at 138. Porter faced over 100,000 lawsuits from individuals claiming bodily harm as a result of asbestos exposure. *Id.* Porter held three insurance policies with Integrity Insurance Company, which was declared insolvent. *Id.* at 139. PIGA took the place of the insolvent insurance company. *Id.* Porter submitted the claims of the injured parties to PIGA for indemnification. *Id.* PIGA took the position that it was obligated to pay only three "claims": one for each insurance policy issued by Integrity, with a $300,000 cap for each claim. *Id.* Porter, on the other hand, argued that each underlying injured party held a separate, compensable claim with a separate $300,000 cap. *Id.*[8] The federal district court granted summary judgment to PIGA. On appeal, the Third Circuit reversed.

¶ 20 The Court articulated the following reasons for its decision that the insured is not the claimant. First, the plain language of the Act then in effect defined a "covered claim," in relevant part, as "the claim of a [holder of or claimant under a property and casualty insurance policy]." *Id.* at 142 (emphasis added).[9] In other words, the Act makes a distinction between insureds and underlying claimants. *Id.* Second, the Court noted that the intent of the Act is to avoid excessive delays in the payment of covered claims, and "to avoid financial loss to policyholders as a result of the insolvency of an insurer." *Id.* Defining "covered claims" to include the claims of underlying injured parties would be consistent with the Act's stated goal of protecting policyholders from losses. *Id.*

¶ 21 Third, the Court concluded that the focus of the statute is on the persons who have been injured. "[W]hen multiple persons have been injured in an accident, each injured person has a covered claim even if their individual claims are asserted by the insured—in this case Porter—rather than the individuals themselves." *Id.*[10] As a matter of public policy, the Court said, "covered claims" should include the claims of underlying injured parties. *Id.* If the contrary were true, PIGA could wrongfully refuse to honor the claims of injured parties, wait for the insured to compel payment, and then argue that these multiple claims had been transformed into a single "claim" by the insured. *Id.* "As a result, insureds would receive virtually no coverage for their claims, and, even if the victims were ultimately able to obtain coverage through the direct action statute [40

---

7. *See also, Main Line Health, Inc. v. Pennsylvania Medical Professional Liability Catastrophe Loss Fund*, 738 A.2d 66, 70 & n. 16 (Pa.Commw.1999) (where a patient brings action against the insured physician, the "claimant" is the "patient/victim" and not the physician), *appeal pending*, No. 265 M.D.App. Dock.1999, —— Pa. ——, 777 A.2d 1048 (Pa.).

8. The *Porter* parties agreed that PIGA would, in no event, be liable for more than $15

million, because each of the three Integrity policies had a $5 million limit.

9. 40 P.S. § 1701.103(5)(a)(i) (repealed).

10. The *Porter* Court further noted that under Pennsylvania's "direct action" statute, 40 P.S. § 117, injured parties may sue a insurance company directly if the insured has gone bankrupt. *Porter*, 75 F.3d at 142. Porter had gone bankrupt. *Id.* at 138.

P.S. § 117], extensive delays and litigation would result." *Id.*

¶ 22 While the statute at issue in *Porter* has been repealed and replaced by the current Act, *Porter* remains instructive because, for purposes of our analysis, the current Act is not materially different from the repealed law. First, the Act maintains a distinction between claimants and insureds. Specifically, the Act defines "covered claims" as those submitted by "a claimant," not necessarily by an insured. 40 P.S. § 991.1803(b)(1)(i)(B); *See also,* 40 P.S. § 991.1802 (defining "covered claim" in part as one where either the claimant or the insured is a Pennsylvania resident). In this respect, we heed the presumption that the Legislature did not intend any words in the statute to be mere surplusage. *Wiernik,* 736 A.2d at 621.

¶ 23 Second, we look to the mischief to be remedied. *Wiernik,* 736 A.2d at 622. We note that the Act is intended "to avoid excessive delay in the payment of [covered] claims and to avoid financial loss **to claimants or policyholders** as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1) (emphasis added). In this respect, the Act is similar to the repealed statute addressed in *Porter.* In other words, the Act is designed, in part, to protect victims with covered claims by assuring that they are paid in a timely fashion.

¶ 24 Third, we look to the object to be attained by the statute. *Wiernik,* 736 A.2d at 622. The Act expressly provides that, with respect to covered claims, PIGA "shall have all rights, duties and obligations of the insolvent insurer as if that insurer had not become insolvent." 40 P.S. § 991.1803(b)(2). Thus, one object of the Act is to ensure that insureds receive, as nearly as possible under the Act, the same level of insurance protection that they would have received if their insurer had not become insolvent. This statutory language tends to establish that "claimant" should be defined as if the insurer had not become insolvent: *i.e.,* pursuant to the terms of the underlying insurance policy.

¶ 25 Fourth, we look to the consequences of a particular interpretation. *Wiernik,* 736 A.2d at 622. PIGA steps in to assist where an insurance company is insolvent and unable to pay claims under insurance policies. 40 P.S. § 991.1803. PIGA promotes the purposes of the Act when it pays covered claims under the bankrupt's policy with the policyholder, thereby avoiding financial loss to the policyholder. In addition to protecting injured third parties, the Act protects policyholders who, through no fault of their own, would otherwise face potentially crippling tort claims without any significant insurance coverage. For these reasons, the definition of "claimant" under the Act should include third parties whose injuries would have been covered under the policy between the insured and the insolvent insurer.

¶ 26 A "claimant," as our above analysis reflects, is a person who has a "covered claim" under the insurance policy at issue. Where a third party has been injured by the insured, the question is whether that party's claim for damages falls within the scope of coverage provided by the policy.[11]

---

11. We observe that a person may have a claim as against the insured but not have a "covered claim" under the Act. This could occur when the insured fails to insure for the risk that occurred. *See,* 40 P.S. § 991.1802 (defining "covered claim" in part as a claim which falls within the scope of the underlying insurance policy). Here, PIGA does not claim that Keystone's policy with the bankrupt American Eagle did not cover the risk that occurred, or that the Campbells could not receive a benefit pursuant to the policy.

The answer to this question should be decided using ordinary principles of contract interpretation and insurance coverage. The answer may or may not be a function of state law, depending on the language of the relevant insurance policy.

¶ 27 More importantly for our purposes, the answer is not necessarily dependent on the structure of, or the applicable procedure respecting, the cause of action (if any) asserted against the defendant/insured in a court of law. Depending on the state in which the action is processed and the specific cause of action asserted, a person could be considered a plaintiff with his or her own cause of action, or a mere beneficiary of a cause of action asserted by another person. Nothing in the Act, however, intimates that the manner in which an action is processed in a state court affects a person's status as a "claimant." Indeed, a third party victim may, in certain cases, assert a claim against the insured without ever filing a formal lawsuit. We do recognize that policyholders purchase policies with reference to the risks/potential lawsuits available under the law of the state in which they do business. Nevertheless, one's status as a "claimant" may have little to do with one's status as a litigant. Thus, we conclude that the proper focus of the inquiry should be on the nature and scope of the insurance policy itself.

¶ 28 The highly respected trial court concluded that only one "claimant" exists because, in Pennsylvania, "individual wrongful death beneficiaries do not have independent causes of action" in that their claims are derivative of a single claim

brought by the estate of the deceased. Trial Court Opinion, 9/14/2000, at 3. Similarly, PIGA argues that if the Campbells had brought their wrongful death action in Pennsylvania, there would be only one "claimant," the estate or personal representative of the decedent.[12]

¶ 29 We decline to agree with this analysis. As noted above, the relevant inquiry should center primarily on the scope of the policy, not on the cause of action or the state in which the action is asserted. Moreover, we need not decide whether the estate of Thomas Campbell or his personal representative is a "claimant" under Pennsylvania law. This issue is not squarely presented in the instant case because: (1) the Campbells did not file their action in Pennsylvania; and, (2) neither the estate of Thomas Campbell nor his personal representative have participated in this action.

¶ 30 PIGA cites *Tulewicz v. SEPTA*, 529 Pa. 588, 606 A.2d 427, 431 (1992) as authority for its position. *Tulewicz* involved a repealed statute that limited damages against Commonwealth agencies to $250,000 for each "plaintiff." *Tulewicz*, 606 A.2d at 430, *citing*, 42 Pa.C.S. § 5111 (repealed). Our Supreme Court held that a wrongful death action has only one "plaintiff," even though multiple people may be beneficiaries of such an action. *Id.* at 431 and n. 9. Thus, the cap applied once for a Pennsylvania wrongful death action because there was only one plaintiff in such an action. *Id.*

¶ 31 *Tulewicz* is readily distinguishable. The statute in *Tulewicz* caps payments on a "per plaintiff" basis, while the Act caps

---

Rather, PIGA claims that the statutory term "claimant" has a limited definition.

**12.** *See, e.g.,* Builders *Transport, Inc. v. South Carolina Property & Casualty Insurance Guaranty Ass'n*, 307 S.C. 398, 415 S.E.2d 419, 423 (App.1992) (one "covered claim" for wrongful

death under South Carolina's version of the Act exists because the plaintiff brought the action in Ohio, where wrongful death actions are brought by the personal representative of the deceased for the benefit of surviving family members).

payments on a "per covered claim" basis.[13] Also, the purpose of the Act differs significantly from that of the statute in *Tulewicz*. The Act is designed to protect claimants and policyholders, not to limit recovery. The statute in *Tulewicz* involved sovereign immunity and limitations on damages regarding actions against the Commonwealth. *See, id.* at 430. Thus, *Tulewicz* is not controlling.

¶ 32 Finally, we turn to PIGA's choice of law argument. PIGA argues that: (1) this Court should engage in a choice of law analysis; (2) Pennsylvania law, rather than Texas law, applies to this case because Pennsylvania has the greater interest in the litigation; and (3) Pennsylvania's interest in the action compels a finding that there is only one "claimant" under the Act.

> In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary. If we determine a conflict is present, we must then analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its law.

*Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa.Super.2000), *appeal denied*, 2001 Pa. Lexis 41 (Pa. Jan 4, 2001). We decline to engage in a choice of law analysis at the present time. As noted above, the relevant inquiry is whether the Campbells as individuals are claimants within the scope of the policy at issue. It would appear that the resolution of this issue depends primarily on issues of contract interpretation and not on where or how such claims are asserted in a court of law. Thus, it is far from clear whether there is a true conflict between state laws in this case.[14]

¶ 33 The parties apparently do not dispute that the Campbells' claims are covered under the American Eagle policy. On the other hand, the parties have not briefed this issue, and the trial court has not addressed it. Moreover, after reviewing the policy that has been included in the certified record, we can not determine whether the Campbells' claims are covered. Our task was made more difficult because many of the policy amendments are barely legible for our review. Accordingly, we decline to decide the case based on an assumption that the Campbells' claims are covered. Rather, we remand for further proceedings. After allowing appropriate briefing and argument, the trial court is directed to: (1) examine the Campbells' claims in light of the policy at issue and the principles set forth above; (2) determine the number of claimants and covered claims; and (3) issue an appropriate declaratory judgment indicating the maximum amount payable by PIGA in light of that analysis.[15] When conducting

---

13. Even if the Act provided a separate cap "per plaintiff," we would note that there are five separate plaintiffs in the Texas action. We also note that PIGA's position would arguably be stronger if the Act provided a $300,000 cap for each **occurrence**, rather than for each claimant. This is not the case. The Legislature chose to provide coverage for each claimant. *See, Porter,* 75 F.3d at 146 (the cap on payments under the Act is based on claims, not occurrences).

14. We note that the policy does not define "claimant", and does not appear to contain a provision indicating which state's law governs the policy or disputes arising thereunder.

15. We do not discount the possibility that choice of law principles will indeed come into play in this case. We simply note that, in light of our decision, it is not obvious that choice of law principles will be necessary to the trial court's disposition of the case. The parties are free to argue choice of law issues

its inquiry, the court should consider whether: (1) the policy is governed by the law of a particular state; and/or (2) the policy is modified to comply with the law of other states.

¶ 34 Reversed and remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

with the trial court if they feel that such    briefing is necessary.